UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:19-CR-70-HAB |
| | ) | |
| CHRISTOPHER RITCHIE | ) | |

**OPINION AND ORDER**

Defendant, Christopher Ritchie, pled guilty to one count of being a convicted felon in possession of a firearm (Count 2) and one count of distributing and possessing with the intent to distribute methamphetamine (Count 3). These charges arose from the Defendant's involvement in the sale of multiple guns and ammunition to a confidential informant (CI). The Presentence Investigation Report calculated the Defendant's total offense level to be 27 and his criminal history category to be V. (ECF No. 41, ¶¶ 34–45, 95). The offense level calculation included a four-level enhancement pursuant to U.S.S.G. §2K2.1(b)(6)(B), which applies to a defendant who uses or possesses a firearm in connection with another felony. Based on the above calculations, the Defendant faces a guidelines range of 120–150 months with a 10-year statutory maximum on Count 2 and a 30-year statutory maximum on Count 3.

The Defendant did not object to the enhancement. However, the Court, cognizant that it has "the ultimate responsibility to ensure that the Guidelines range it considers is correct," *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1904 (2018), requested the parties to brief whether application of § 2K2.1(b)(6)(B) was appropriate given the particular facts of this case. Additionally, the Court requested briefing on whether the two counts should be grouped. Briefing on these issues has been completed and the issues are ripe for the Court's consideration.

**Discussion**

a. **Factual Basis**

The parties agree that the offense conduct relevant to the four-level enhancement is contained in paragraphs 9 through 19 of the PSR. Those paragraphs reflect that in late 2018, an ATF CI advised that he knew the Defendant, a.k.a. "Train Wreck," from 2017 and 2018. At the direction of the ATF, the CI made contact with the Defendant near the end of 2018. Subsequently, the CI became aware that the Defendant was in possession of firearms and ammunition that he wished to sell.[1] This was confirmed when the Defendant sent the CI a list of eight guns for sale, which included pistols, shotguns, rifles, and an AR-15.

On January 31, 2019, an undercover ATF agent (UC), and the CI met with the Defendant in Spencerville, Indiana. The UC purchased an AR-15 rifle, ammunition and a 9 mm pistol with a magazine and ammunition. Prior to this deal, the CI and the Defendant exchanged text messages to arrange the meeting. These messages were photographed by law enforcement and, as the Defendant points out, the sale or acquisition of controlled substances was not discussed in these messages.

During the transaction, the Defendant showed other weapons to the UC and negotiated prices for the weapons. The Defendant also stated, in passing reference, that he had friends with methamphetamine for sale. The CI paid the Defendant for the 9 mm Taurus Pistol and the UC paid $700 for the AR-15 rifle and ammunition. The Defendant attempted to sell a second rifle to the UC, but ultimately, the UC did not purchase that firearm.

---

[1] The Defendant had been arrested in early January 2019, in Hicksville, Ohio, with a methamphetamine pipe and two firearms. After that arrest, the Defendant contacted the CI and inquired if he knew anyone who was looking for guns and ammunition. (PSR, ¶10).

The CI maintained contact with the Defendant over the next few months. In February 2019, the Defendant sent photographs of multiple firearms, firearm parts and accessories that he had for sale. In April 2019, the CI sent the Defendant text messages about purchasing more guns. All this culminated on May 10, 2019, when the UC and the CI met with the Defendant to purchase additional weapons. Prior to this meeting, the Defendant and the CI discussed the meeting place for the transaction. The telephone call was recorded and provided to the Court. There was no discussion on the call about the sale of methamphetamine or any other controlled substance.

During the May 10 meeting, which was video recorded and provided to the Court for review, the Defendant showed the UC a "bad-ass" Russian sniper rifle from World War II – specifically, a Mosin-Nagant rifle. The Defendant had set up a target and encouraged the UC to fire the rifle. After seeing the rifle (and declining to fire it), the UC asked the Defendant if he was trying to sell that firearm as well. The Defendant then offered the rifle for sale for $500 after explaining that it is "100% original" and had been brought back from overseas and assembled in pieces. The UC indicated he was not interested in purchasing the Mosin-Nagant rifle.

The Defendant and the UC then negotiated a price for a M1 .30 carbine rifle with 400-500 rounds and a shotgun. The Defendant returned the Mosin-Nagant rifle to his vehicle and the UC and CI completed the sales of the rifle, ammunition, and shotgun. The Defendant indicated that he had a crate of .30 caliber ammunition at another location, but the UC indicated he would pick it up from the Defendant at a later date.

After the gun sales were concluded, the CI, at the request of the UC,[2] asked the Defendant if he had any methamphetamine for sale. The Defendant responded "no."[3] However, the Defendant then retrieved a small amount of methamphetamine from his vehicle. The Defendant placed the unwrapped methamphetamine in the palm of his hand and scraped it from his hand into the palm of the CI's hand. The Defendant then offers the CI a dollar to "wrap it in." The CI asked the Defendant if it was "free" and the Defendant responded "yea." The discussion continues with the CI asking the Defendant if he can get more because he will "probably get ounces." The Defendant responds, "I can, but it is a hassle." After a bit more discussion, the conversation ends, and the Defendant returns to his vehicle and drives away. The UC can be heard broadcasting over the police radio that the Defendant has a Mosin-Nagant rifle in his truck. The Defendant is stopped shortly thereafter.

A search of the Defendant's vehicle uncovered ammunition, the Mosin-Nagant rifle, a metal container with 4 small plastic bags, and a glass smoking device. Two of the plastic bags contained a white crystal substance, one contained a brown powder, and one bag was empty. These substances tested positive for methamphetamine with total bag weight of 6.6 grams. A glass-smoking device was found in the center console, along with a silver metal spoon with burnt residue and an orange and white syringe.

b. **U.S.S.G § 2k2.1(b)(6)(B)**

As noted, the PSR assessed Defendant the four-level enhancement under U.S.S.G. §2K2.1(b)(6)(B) which provides for a four-level increase in a base offense level if the defendant:

---

[2] The UC asked the CI to inquire if the Defendant "got any."

[3] A brief discussion ensued about "addiction" and how the Defendant had been clean for seven years but got back into using. During the discussion, either the UC or the CI indicate that they use methamphetamine as well.

> used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense.

The Commentary states that the enhancement should apply "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense or another offense, respectively." U.S.S.G. §2K2.1, cmt. n. 14(A). The enhancement can be applied regardless of whether the defendant was charged or convicted of the other offense. *United States v. Sandidge*, 784 F.3d 1055, 1062 (7th Cir. 2015). The enhancement further applies "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia . . . because the presence of the firearm has the potential of facilitating another felony offense." U.S.S.G. §2K2.1(b)(6)(B), cmt. n. 14(B). The Government bears the burden of proving the applicability of the enhancement by a preponderance of the evidence. *Sandidge,* 784 F.3d at 1062.

Recently, this Court has had several occasions to delve into the application of §2K2.1(b)(6)(B), albeit in varying contexts. *See United States v. Sandy*, 1:19-CR-95 HAB-SLC (N.D. Ind. Dec. 16, 2020) and *United States v. Yoder*, 1:19-CR-86- HAB, 2020 WL 7396422 (N.D. Ind. December 17, 2020). Pertinent here is this Court's decision in *Sandy*. In that case, this Court applied the enhancement where the Defendant arrived at a controlled drug buy armed with a .357 revolver and had a history of armed drug dealing. In finding the enhancement proper, this Court discussed the clear line drawn by the Seventh Circuit as to when the enhancement applies. This Court reiterated the Seventh Circuit's position that "[m]ere contemporaneous possession while another felony is being committed is not necessarily sufficient" and "possessing a gun while engaged in the casual use of drugs might not give rise to the inference that the gun was possessed in connection with the drugs." *Id.* at 2 (quoting *United States v. Briggs*, 919 F.3d 1030, 1032 (7th

5

Cir. 2019). However, the Court also highlighted the fact that "powerful support for the inference that the firearm was used in connection with the drug trafficking operation," exists when firearms are found in close proximity to illegal drugs for sale. *Id.* (quoting *United States v. Meece*, 580 F.3d 616, 621 (7th Cir. 2009). From there, this Court concluded that "guns near drug use does not give rise to an inference that the enhancement applies, while guns near drug distribution does." *Id.* at 3. Applying these rules to the facts, the Court found determinative that the revolver, although offered for sale after the conclusion of a drug sale, "had the potential to facilitate the felonious transaction." *Id.* at 3.

This leads the Court down the path of the particular facts here. The Defendant acknowledges (he would be hard-pressed to do otherwise) that the Mosin-Nagant rifle was found in his vehicle in close proximity to drugs, thereby raising an inference that the enhancement applies. However, the Defendant asserts that the gun and the drugs were not possessed "in connection with" each other and, unlike *Sandy*, there is nothing before the Court to demonstrate that the rifle facilitated any drug conduct, especially not drug distribution.

Defendant's argument is two-fold. First, the Defendant points out that he has consistently acknowledged and the PSR confirms that he uses methamphetamine for personal consumption to the tune of a $200 per week habit. He asserts that the drugs and paraphernalia in the vehicle clearly demonstrate his intention to consume the drugs, not sell them or protect them with the firearms he was offering for sale. In fact, the sole firearm in the vehicle was one he had, moments before, tried to sell to the UC. Thus, the Defendant asserts that "had he been successful in selling the rifle to the UC, it would not have been in the car when he was later stopped by law enforcement…and there would be not question about whether he had possession of a firearm or ammunition in connection with his drug possession." (ECF No. 45 at 6).

6

Second, the Defendant emphasizes that this was not a drug investigation. He was being investigated by the ATF because he had upwards of two dozen firearms and substantial ammunition to sell. All the conversations between the Defendant and the CI leading up to the two meetings discussed firearms sales and both meetings were set up for the purpose of the Defendant selling firearms to the CI and UC.  During the May 10 transaction, the Defendant offered the Mosin-Nagant for sale and then completed other firearms transactions. Only after the firearms transaction had completed did the UC inquire about whether the Defendant had drugs for sale. Even then, the Defendant indicated he did not have meth for sale but provided a small amount of methamphetamine to the UC. Thus, the Defendant asserts that the totality of the evidence clearly demonstrates that he was not utilizing the firearms as protection for his drugs nor did he intend to do so. In his view, the connection between the drugs in the vehicle and the firearm in the vehicle was coincidental.

The Government, in turn, concedes that "[b]ecause of the relatively small amount of methamphetamine and the evidence of drug use, the government actually agrees with [the Defendant's] basic position on this protection theory." (ECF No. 49).[4] This Court agrees with both the Government and the Defendant. Having reviewed the relevant portions of the PSR and the video of the May 10 transaction, this Court finds that the presence of the Mosin-Nagant in the vehicle, despite its proximity to drugs, was merely coincidental to the presence of drugs that were, no doubt, for the Defendant's personal consumption. There is nothing in the record to demonstrate that the firearm served some felonious purpose connected to the drugs. As defense counsel notes, the firearm would not have been in the vehicle had the UC agreed to purchase it.

---

[4] The Government further acknowledges that "a Russian sniper rifle in the back seat was not the best choice for protection while riding around in a vehicle. A loaded and concealed handgun on one's person or in a strategic location would have been a much better means of protection. For these general reasons, the government does not believe that the usual protection theory is applicable … to justify the enhancement…" (ECF No. 49 at 9).

Nevertheless, the Government proposes an alternate theory in an attempt to sustain the enhancement, that is, that the Defendant provided methamphetamine for free to the UC to "sweeten the pot" and facilitate future gun sales to the UC, in particular the sale of the Mosin-Nagant and unspecified pistols. The Government paints a picture of the Defendant as a consummate salesman. It contends that the Defendant "intended to maintain his business relationship with the UC because [the Defendant] still owed the UC several hundred rounds of ammunition and because the UC was asking about buying some pistols in the future …Just like anyone in sales who might wine and dine a client, [the Defendant] was interested in keeping their interest and their future business by supplying a methamphetamine sample for free." (ECF No. 49 at 10). Thus, in the Government's view, the Defendant was creating goodwill for future purchases and "ingratiating his buyers for a future sale." *Id.*

Of course, while an interesting plot twist, this is creative fancy on the Government's part and unsupported by any true evidence before the Court of the Defendant's intent. The Government asserts that the video evidence raises an inference that the Defendant's future gun sales were "packaged with his promise to secure ounces of methamphetamine." (ECF No. 49 at 10). But this is a stretch by the Government. Just as likely is a more innocent scenario where one addict was "helping out" another. Nevertheless, after the Defendant provided the CI with the "free meth," the video recording reveals the CI asking the Defendant if he can get more because he will probably buy "ounces." The Defendant responds that he can get more "but it is a hassle." And that's all there is. The Court fails to make the leap of how a Defendant's statement that obtaining more drugs "is a hassle" translates into a promise to pair future gun sales with drugs. This Court has previously indicated its unwillingness "under the guise of inference, to allow the Government to satisfy its burden through generalization and speculation," *Yoder*, 2020 WL 7396422 at *2. The same is true

here. The Government has failed to demonstrate the applicability of §2K2.1(b)(6)(B) by a preponderance of the evidence. Accordingly, the enhancement does not apply.

### c. Grouping

On the issue of grouping the Government and the Defendant agree that if the enhancement in §2K2.1(b)(6)(B) does not apply, Counts 2 and 3 are not considered a single group because possession of the gun is not considered relevant conduct to the drug offense under U.S.S.G. §3D1.2. However, the parties further agree that regardless of whether the counts are grouped, the calculation of the total offense level produce the same result and would result in an adjusted offense level of 26. After taking into account the three-level reduction for the Defendant's acceptance of responsibility, the total offense level is 23.

## CONCLUSION

For the foregoing reasons, the Court finds that the four-level enhancement in U.S.S.G. §2K2.1(b)(6)(B) should not be applied to the Defendant's base offense level. The probation officer is ORDERED to prepare a revised presentence investigation report in accordance with the findings in this Opinion and Order.

SO ORDERED on February 18, 2021

                                           s/ *Holly A. Brady*
                                           JUDGE HOLLY A. BRADY
                                           UNITED STATES DISTRICT COURT